# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:19-cv-05393-WMR |
| | § | |
| THE ROCKET SCIENCE | § | |
| GROUP LLC d/b/a MAILCHIMP, | § | |
| | § | |
| Defendant. | § | |

# PLAINTIFF'S RESPONSE TO DEFENDANT
# MAILCHIMP'S MOTION TO DISMISS AMENDED COMPLAINT

# **TABLE OF CONTENTS**

*Page*

Table of Authorities ................................................................................ iii

Introduction ............................................................................................... 1

Background ................................................................................................. 2

Legal Standard ........................................................................................... 3

Argument ..................................................................................................... 4

I.  There Is No Basis To Dismiss The TVPRA Claim ........................... 4

    A.  Mailchimp's conduct violates the TVPRA ............................. 4

    B.  Mailchimp's challenges to Jane Doe's TVPRA claim fail ................. 6

        1.  Mailchimp participated in a sex trafficking venture .................. 6

        2.  The venture violated sex trafficking laws .................................. 7

        3.  Mailchimp knew or should have known that the venture was violating sex trafficking laws ................. 8

        4.  Mailchimp benefited from participating in the venture ...................................................................... 10

II.  Section 230 Of The CDA Does Not Bar Jane Doe's State Law Claims .................................................................................. 11

    A.  The standards for finding federal preemption are narrow .................. 11

    B.  Section 230 as amended does not preempt state civil claims for human trafficking ................. 12

        1.  The relevant statutory language ................................................ 12

        2.  Jane Doe's claims are consistent with the federal sex trafficking statute ................. 14

3.   FOSTA's language reinforces the lack of preemption ..............................................................15

4.   The presumption against preemption requires that Mailchimp's construction be rejected ........................................17

C.   The sex trafficking claims do not treat Mailchimp as a publisher ..........................................................................17

1.   The statutory language is narrow ...............................17

2.   The terms "publisher" and "speaker" relate to defamation..................................................................18

III.   The Complaint Adequately Alleges Jane Doe's State Law Claims ..........................................................................20

A.   The Complaint states a claim for negligence ......................................20

1.   Mailchimp owed a duty to Jane Doe .......................20

2.   Mailchimp's conduct caused Jane Doe's harm ......................22

B.   Jane Doe is not prohibited from pleading negligence per se .............24

C.   The Complaint states a claim for gross negligence............................24

D.   Georgia law does not prohibit aiding and abetting claims.................25

Conclusion ...........................................................................................25

Certificate of Service .........................................................................28

Certificate of Compliance ..................................................................28

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981) ...........................................................................11

*In re Arby's Rest. Grp. Inc. Litig.*,
No. 1:17-CV-0514-AT, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) ...............24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...........................................................................3

*Bailey v. Wheeler*,
843 F.3d 473 (11th Cir. 2016) .........................................................3, 8

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ...........................................................18

*Estate of Bass v. Regions Bank, Inc.*,
947 F.3d 1352 (11th Cir. 2020) ...........................................................3

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005) ...........................................................................17

*Bethany Grp., LLC v. Grobman*,
727 S.E.2d 147 (Ga. Ct. App. 2012) .................................................23

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) .........................................................11, 12, 14, 16, 17

*City of Chi., Ill. v. StubHub!, Inc.*,
624 F.3d 363 (7th Cir. 2010) .........................................................18, 19

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ...........................................................20

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
362 F. Supp. 3d 1295 (N.D. Ga. 2019) .............................................23

*Fed. Deposit Ins. Corp. v. Boggus*,
    No. 2:13-CV-00162-WCO, 2014 WL 12479645
    (N.D. Ga. Aug. 25, 2014) ...................................................................25

*Geiss v. Weinstein Co. Holdings LLC*,
    383 F. Supp. 3d 156 (S.D.N.Y. 2019) ...............................................10

*Herrington v. Deloris Gaulden*,
    751 S.E.2d 813 (Ga. 2013) .................................................................22

*Higdon v. Jackson*,
    393 F.3d 1211 (11th Cir. 2004) .........................................................24

*Insight Tech., Inc. v. FreightCheck, LLC*,
    633 S.E.2d 373 (Ga. Ct. App. 2006)..................................................25

*Jackson v. Bank of Am., N.A.*,
    898 F.3d 1348 (11th Cir. 2018) ...........................................................3

*Jones v. Dirty World Entm't Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) .............................................................18

*McLain v. Mariner Health Care, Inc.*,
    631 S.E.2d 435 (Ga. Ct. App. 2006)..................................................21

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)........................................................11, 12, 15, 19

*Plaintiff A v. Schair*,
    No. 2:11-CV-00145-WCO, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014).........4

*Ricchio v. Bijal, Inc.*,
    No. CV 15-13519-FDS, 2019 WL 6253275 (D. Mass. Nov. 22, 2019) ........6, 21

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)...........................................................................12

*Siavage v. Gandy*,
    829 S.E.2d 787 (Ga. Ct. App. 2019)..................................................25

Page(s)

*Stratton Oakmont, Inc. v. Prodigy Servs. Co.*,
  1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ................................................19

*TMX Fin., LLC v. Goldsmith*,
  833 S.E.2d 317 (Ga. Ct. App. 2019)................................................25

*Warner v. Arnold*,
  210 S.E.2d 350 (Ga. Ct. App. 1974)................................................23

*Wood v. Olson*,
  121 S.E.2d 677 (Ga. Ct. App. 1961)................................................25

*Yates v. United States*,
  135 S. Ct. 1074 (2015)................................................18

*Zaldivar v. Prickett*,
  774 S.E.2d 688 (Ga. 2015) ................................................23

*Zeran v. America Online, Inc.*,
  129 F.3d 327 (4th Cir. 1997) ................................................18

**Statutes**

18 U.S.C § 1591................................................13

18 U.S.C. § 1591(a) ................................................4, 5, 7

18 U.S.C. § 1591(e)(4)................................................5

18 U.S.C. § 1595................................................13

18 U.S.C. § 1595(a) ................................................4, 6, 10, 11, 14, 21

47 U.S.C. § 230(b) ................................................19

47 U.S.C. § 230(c)(1)................................................12, 17, 18

47 U.S.C. § 230(e) ................................................13, 14

GA. CODE ANN. § 51-1-4................................................25

*Page(s)*

**Rules**

Fed. R. Civ. P. 8(d)(2)...............................................................................24

Fed. R. Civ. P. 12(b)(6).............................................................................3

**Constitutional Provision**

U.S. Const. art. VI, cl. 2 ...........................................................................11

**Other Authorities**

141 Cong. Rec. H8469-72 (daily ed. Aug. 4, 1995)..................................19

Bob Goodlatte, FOSTA Committee Report, H.R. Rep. No. 115-572 ......16

H.R. Rep. No. 104-458 (1996)...................................................................19

Pub. L. No. 115-164, 132 Stat. 1253 (2018).......................................15, 16

# **INTRODUCTION**

Mailchimp claims that it cannot be liable for damages stemming from sex trafficking resulting from its services because it is not an "actual" sex trafficker. But the Trafficking Victims Protection Reauthorization Act (TVPRA) does not limit civil liability to "actual" sex traffickers or those who specifically intend to facilitate sex trafficking. Rather, the statute extends liability to defendants like Mailchimp who benefit from business dealings with persons who they "should have known" were violating sex trafficking laws.

While Mailchimp asserts that any state tort claims are preempted by the Communications Decency Act (CDA), Mailchimp's arguments are not consistent with the text and purpose of the CDA or the strong presumption against preemption. The CDA was created to curb defamation liability for internet companies stemming from content posted by third parties. Section 230 of the CDA explicitly states that it does *not* preempt state laws that are consistent with the section, and Congress recently amended Section 230 to reinforce that the section has *no effect* on sex trafficking law. Jane Doe's state law claims challenging Mailchimp's conduct profiting from sex trafficking are entirely consistent with the CDA. These state law claims are not preempted, are adequately pleaded, and are proper under Georgia law.

## BACKGROUND

Sex trafficking is a multi-billion dollar industry that has experienced extreme growth in recent years due to the increased use of the internet to facilitate the sale of its victims. Dkt. 35 ¶¶ 4, 27-28. The website Backpage served as the internet's dominant marketplace for sex trafficking until it was seized by the U.S. government. *Id.* ¶¶ 3, 30-32. The seizure of Backpage was significant international news and resulted in policy changes at major technology companies. *Id.* ¶¶ 33-34.

YesBackpage openly claims to be a replacement for Backpage and, like Backpage, serves as a forum for sex traffickers to sell their victims. *Id.* ¶¶ 4-5, 9, 35, 38-39. YesBackpage hired Mailchimp, an internet marketing company, to send email campaigns seeking sex traffickers to post victims for sale on YesBackpage. *Id.* ¶¶ 6-11, 54, 61-67, 81. For example, Mailchimp sent an email to sex traffickers for YesBackpage, highlighting that YesBackpage's servers had moved to the Netherlands so its users' "information is safer from the gov, as is the site." *Id.* ¶ 21. Mailchimp knew or should have known that YesBackpage was advertising sex trafficking, particularly in light of YesBackpage's explicit references to Backpage and Mailchimp's monitoring of its users. *Id.* ¶¶ 6-9, 30-41, 48-54, 76, 81.

Plaintiff Jane Doe is a sex trafficking victim. *Id.* ¶ 20. Throughout July and August of 2018, Mailchimp sent targeted emails to Jane Doe's sex trafficker on

behalf of YesBackpage. *Id.* ¶ 22. As a result, Jane Doe's trafficker trafficked Jane Doe for sex through postings on YesBackpage throughout 2018. *Id.* ¶¶ 22-24, 55. Jane Doe sustained irreversible injuries because of being trafficked on YesBackpage due to Mailchimp's email campaign. *Id.* ¶¶ 12, 20-24, 55, 81, 91-93. Jane Doe seeks redress under the TVPRA and Georgia law. *See* Dkt. 35 (the "Complaint").

## **LEGAL STANDARD**

To avoid dismissal under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" such that the facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).[1] While the plaintiff's claim to relief must be plausible, it need not be probable. *Id.* The Court must "accept as true the facts alleged in the complaint, drawing all reasonable inferences in a plaintiff's favor." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

---

[1] Mailchimp vaguely states that the Complaint may also be subject to dismissal as a "shotgun pleading" because it incorporates certain allegations into its claims by reference. Dkt. 43-1 at 6 n.2. Mailchimp never develops this argument, and it should be rejected for that reason alone. The mere fact that the Complaint at points incorporates prior allegations does not subject it to dismissal. Mailchimp's cited case states that a "shotgun pleading" renders a plaintiff's allegations unintelligible, but Mailchimp never argues that is the case here. *Estate of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1356 & nn.3-5 (11th Cir. 2020). In any event, a court must allow the plaintiff to remedy any such deficiency before ordering dismissal. *Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).

<u>**ARGUMENT**</u>

## I.     <u>There Is No Basis To Dismiss The TVPRA Claim.</u>

### A.     **Mailchimp's conduct violates the TVPRA.**

The TVPRA permits a sex trafficking victim to "bring a civil action against the perpetrator (or whoever knowingly benefits … from participation in a venture which that person knew or should have known has engaged in [sex trafficking])." 18 U.S.C. § 1595(a). Therefore, the statute creates a civil claim against perpetrators *and* other persons who benefit from participating in a venture that they should have known was engaged in a violation. *See Plaintiff A v. Schair*, No. 2:11-CV-00145-WCO, 2014 WL 12495639, at *3 (N.D. Ga. Sept. 9, 2014). The Complaint adequately alleges that (1) YesBackpage violated 18 U.S.C. § 1591(a), (2) Mailchimp knowingly benefitted from participating in a venture with YesBackpage, and (3) Mailchimp should have known YesBackpage was perpetrating violations.

First, the Complaint alleges that YesBackpage perpetrated a violation of 18 U.S.C. § 1591(a) by advertising persons for sex trafficking or benefitting from participating in such advertisement. YesBackpage openly states that it is a replacement for Backpage, a well-known sex trafficking hub that was seized by the U.S. government. Dkt. 35 ¶¶ 3-5, 30-39. YesBackpage engages in sex trafficking under Section 1591(a)(1) by providing a forum for advertising sex trafficking

victims for sale. *Id.* ¶¶ 5-6, 22-24, 35-36, 42, 55, 63. For essentially the same reasons, YesBackpage also violated Section 1591(a)(2) by assisting sex traffickers in advertising their victims. *See* 18 U.S.C. § 1591(e)(4) (a party "participates" in a venture by "knowingly assisting, supporting, or facilitating" a violation).

Second, the Complaint alleges that Mailchimp knowingly benefited from participating in a venture with YesBackpage. Mailchimp played an integral role in facilitating sex trafficking by assisting YesBackpage in making targeted communications to sex traffickers and encouraging them to post additional victims for sale. Dkt. 35 ¶¶ 22-25, 54, 60-61, 63-66. YesBackpage was a paying customer of Mailchimp, and therefore Mailchimp benefitted financially from the relationship. *Id.* ¶¶ 63-66. Mailchimp also benefitted through advertising itself on YesBackpage emails and collecting information on YesBackpage's contacts. *Id.* ¶¶ 10, 67-72.

Third, the Complaint alleges that Mailchimp knew or should have known that the venture was engaged in violations of Section 1591. Mailchimp knew of the activity occurring through YesBackpage and knowingly facilitated YesBackpage's trafficking when it sent email campaigns to sex traffickers. *Id.* ¶¶ 11, 25, 61. Moreover, YesBackpage was created following the U.S. government's highly publicized seizure of Backpage. *Id.* ¶¶ 4-5, 9, 29-30, 32-35. As its name makes clear, YesBackpage served as a replacement for Backpage and openly advertised itself as

such. *Id.* ¶¶ 4-5, 9, 35-41. Moreover, Mailchimp monitors its customers' activities to ensure compliance with policies that prohibit promoting websites offering illegal activities or sexual encounters. *Id.* ¶¶ 37-40, 48-62. The Complaint sufficiently alleges that Mailchimp "should have known" that YesBackpage was engaged in violations of sex trafficking laws and that Mailchimp assisted such violations.

## B. Mailchimp's challenges to Jane Doe's TVPRA claim fail.

### 1. *Mailchimp participated in a sex trafficking venture.*

Mailchimp argues that Jane Doe fails to allege that Mailchimp participated in a sex trafficking venture because Mailchimp must have associated with another entity for the "purpose" or "object" of sex trafficking . Dkt. 43-1 at 8-10. But Section 1595 does not require that Mailchimp participate in the venture with the subjective "purpose" of furthering sex trafficking. To the contrary, liability may be imposed on Mailchimp even where Mailchimp "should have known" (but did not actually know) that the venture was engaged in a violation of sex trafficking laws. 18 U.S.C. § 1595(a). The statute essentially imposes a knowledge requirement akin to a negligence standard. *See Ricchio v. Bijal, Inc.*, No. CV 15-13519-FDS, 2019 WL 6253275, at *9 (D. Mass. Nov. 22, 2019). Mailchimp's attempt to impose a heightened specific intent standard is improper. While Mailchimp must have participated in a venture that was engaged in a violation of sex trafficking laws, and

Mailchimp's participation must have facilitated that violation, Mailchimp need not have been actually aware of the sex trafficking or have desired that result. And contrary to Mailchimp's suggestions, the Complaint contains ample allegations that Mailchimp engaged in "overt acts" that assisted YesBackpage in its violation of sex trafficking laws. *See supra* at 5 (Mailchimp helped YesBackpage market itself to sex traffickers so that they would advertise their victims on YesBackpage).

### 2. *The venture violated sex trafficking laws.*

Mailchimp argues that there are "no allegations" that the venture violated Section 1591(a)(2) because there are no allegations that YesBackpage or Mailchimp knew that "means of force" would be used to cause Jane Doe to engage in a commercial sex act. Dkt. 43-1 at 10-11. But YesBackpage explicitly stated that its purpose was to serve as a replacement for known sex trafficking hub Backpage, and it did so. *See supra* at 5-6. Sex trafficking is, by definition, involuntary and accomplished by force. *See* 18 U.S.C. § 1591(a). It makes no sense to say that YesBackpage intended to serve as a replacement sex trafficking hub but was unaware that such activities were nonconsensual and involved the use of force.[2]

---

[2] To the extent Mailchimp suggests that Jane Doe was required to allege that YesBackpage or Mailchimp had knowledge that Jane Doe *specifically* would be subject to force, Mailchimp has cited no authority for this requirement.

There are ample allegations that Mailchimp knew or should have known that YesBackpage was engaged in sex trafficking. *See infra* Part I(B)(3). Similarly, Mailchimp's argument that Jane Doe failed to allege that YesBackpage benefitted from sex trafficking under Section 1591(a)(2) cannot be squared with the Complaint. Sex traffickers who posted victims like Jane Doe for sale were the customers through which YesBackpage benefitted. *See, e.g.*, Dkt. 35 ¶¶ 5-9, 11, 21-26, 35, 38-42.

### 3. *Mailchimp knew or should have known that the venture was violating sex trafficking laws.*

Mailchimp argues that Jane Doe has failed to allege that Mailchimp knew or should have known that its venture with YesBackpage was violating sex trafficking laws and that it is implausible for Mailchimp to know the activities of all of its users. Dkt. 43-1 at 11-15. Mailchimp purports to monitor its users' activities, so it should have known that YesBackpage was engaged in illegally advertising sex for sale. Dkt. 35 ¶¶ 37-40, 48-53. The scope of what Mailchimp learned through its monitoring is a fact issue that must be resolved in Jane Doe's favor. *See Bailey*, 843 F.3d at 480. More importantly, due to YesBackpage's association with Backpage, YesBackpage was not similarly situated to Mailchimp's other customers. *See* Dkt. 35 ¶¶ 9, 38. The seizure of Backpage was major intentional news and was particularly impactful among technology companies like Mailchimp. *Id.* ¶¶ 31-34. Thus, it is not true that

the Complaint contains "no allegation that Mailchimp knew anything about the nature of Backpage's business" or that there are no allegations that Mailchimp should have known of YesBackpage's aspirations to replace Backpage. Dkt. 43-1 at 13-14. Due to the publicity associated with Backpage, and YesBackpage's unconcealed desire to replace Backpage, it is at least plausible that Mailchimp knew or should have known about the nature of YesBackpage's activities.

While Mailchimp suggests that it could not have known about YesBackpage's activities because YesBackpage's emails do not explicitly reference "facially illegal" activity, this argument ignores that YesBackpage's emails openly connect YesBackpage to the illegal operations of Backpage. Dkt. 43-1 at 1-2, 5, 13, 15. Moreover, Mailchimp is not immune from liability merely because YesBackpage's emails use coded language rather than *explicitly* referencing "sex trafficking." *See* Dkt. 35 ¶¶ 21, 38 (YesBackpage contains advertisements by "real escorts, massage professionals, and more," and advertisements for "body rubs, strippers, adult jobs"). The statute requires only that Mailchimp "should have known" of the nature of YesBackpage's activities, not that Mailchimp was unambiguously informed of it. Relatedly, Mailchimp's argument that it "would have been entirely reasonable [for Mailchimp] to have understood YesBackpage's aspiration to serve as a Backpage 'alternative' to mean that it would provide a marketplace for legal services that had

been offered on Backpage" is misplaced. Dkt. 43-1 at 15. Backpage was not used primarily for any "legal services." Dkt. 35 ¶¶ 3, 32. In any event, Mailchimp's request that the Court draw inferences in its favor by adopting its "entirely reasonable" version of events is improper at this stage.

### 4. *Mailchimp benefited from participating in the venture.*

Mailchimp argues that Jane Doe fails to sufficiently allege that Mailchimp benefitted from Jane Doe's sex trafficking because there is an insufficient "causal relationship" between the sex trafficking act and the benefit Mailchimp received. Dkt. 43-1 at 15-16. While Mailchimp must benefit from participation in the sex trafficking venture (as opposed to benefitting from doing business with sex traffickers in ways unrelated to sex trafficking), Jane Doe's allegations satisfy that standard. *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019). Jane Doe alleges that Mailchimp benefitted—financially and through collecting data for its business—by helping YesBackpage advertise to sex traffickers. *See* Dkt. 35 ¶¶ 63-66 (YesBackpage paid Mailchimp to "distribute advertisements for persons to use the YesBackpage website to illegally post sex for sale"); *id.* ¶¶ 10, 67-72 (Mailchimp mined data for its own benefit); *see also* 18 U.S.C. § 1595(a) (defendant may not benefit "financially *or by receiving anything of value*" (emphasis added)). Thus, it is not true that Jane's Doe's sex trafficker is

the only person alleged to have benefitted from Jane Doe's trafficking. *See also supra* at 8 (discussing benefits YesBackpage gained). Mailchimp also argues that, even if Mailchimp was paid by YesBackpage, its payment was not "based on Jane Doe's victimization." Dkt. 43-1 at 16. Neither the statute nor case law requires that the defendant receive compensation "based on" whether the plaintiff in particular was victimized or have the specific intent to profit from the plaintiff's victimization. The statute asks only whether Mailchimp benefitted by participating in a venture that it should have known was violating sex trafficking laws. 18 U.S.C. § 1595(a).

## II. Section 230 Of The CDA Does Not Bar Jane Doe's State Law Claims.

### A. The standards for finding federal preemption are narrow.

Congressional intent must be the "ultimate touchstone" in any preemption analysis. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). That intent is primarily discerned from the statutory language and framework. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996). Courts must also consider the context of the statute, including its history, structure, and purpose.

The Supremacy Clause invalidates state laws that are "contrary" to federal law. U.S. CONST. art. VI, cl. 2; *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 522 (1981). But there is a strong presumption against preemption in areas of traditional state regulation, such as remedies for personal injuries. *Medtronic*, 518

U.S. at 485; *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947). Any preemption analysis must therefore "start with the assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that [is] the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485; *Cipollone*, 505 U.S. at 516. The presumption against preemption applies to *whether* Congress preempted state law and to the *scope* of preemption. *Medtronic*, 518 U.S. at 485. While an express preemption provision means Congress intended some preemption, courts "must nonetheless 'identify the domain expressly pre-empted.'" *Id.* at 484.

**B.  Section 230 as amended does not preempt state civil claims for human trafficking.**

**1.  *The relevant statutory language.***

Three provisions of the CDA that are critical to the preemption analysis. Mailchimp relies entirely on the first and fails to fully engage the other two.

First, Section 230(c)(1) states:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. § 230(c)(1). Mailchimp contends this provision grants "immunity" to interactive computer services from any claim that depends on third-party content. Dkt. 43-1 at 16-21. Such a construction would effectively immunize internet and technology companies from *any liability* for torts committed, regardless of the

company's level of knowledge. The plain statutory language, construed in context, does not support such an all-encompassing construction. *See infra* Part II(B)-(C).

Second, Section 230(e)(3) contains a preemption clause and savings clause:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(e)(3). This is an unusual preemption provision in that it appears to merely reiterate the principle that a federal statute preempts inconsistent state law. The Court's task is to determine the scope of the provision's preemptive effect.

Third, Section 230(e)(5) clarified that the Allow States and Victims to Fight Online Sex Trafficking Act (FOSTA) had no effect on sex trafficking law. *See* 47 U.S.C. § 230(e)(5). Although the original CDA did not preempt state civil sex trafficking claims, the 2018 FOSTA amendment reemphasized that intent in light of federal cases holding that the CDA barred many claims against internet companies. In FOSTA, Congress added Section 230(e)(5), entitled "No effect on sex trafficking law." It states that nothing in Section 230 "shall be construed to impair or limit…[c]ivil claims under a federal statute, 18 U.S.C. § 1595, for facilitating sex trafficking if the underlying conduct violates 18 U.S.C § 1591" or limit certain criminal prosecutions related to sex trafficking and online prostitution. *Id.*

### 2. **Jane Doe's claims are consistent with the federal sex trafficking statute.**

Any analysis of Section 230's preemptive scope must consider the effect of the 2018 FOSTA amendments in Section 230(e)(5). *See Cipollone*, 505 U.S. at 520-21 (statute had different preemptive scope after amendment). The CDA preemption provision, Section 230(e)(3), confirms that "any State law that is consistent" with Section 230 is not preempted. 47 U.S.C. § 230(e)(3). Because the FOSTA amendment is part of Section 230, state laws that are consistent with the amendment are not preempted. The question is whether Jane Doe's claims are consistent with the exemptions in subsection (e)(5), such as the exemption for Section 1595 claims.

Section 1595 imposes liability on "whoever knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in [sex trafficking]." 18 U.S.C. § 1595(a). Jane Doe's tort claims allege Mailchimp breached a duty: in failing to stop or allowing the posting of Jane Doe; failing to monitor emails sent on its platform to determine whether they were associated with illegal activities; and failing to confirm that its customers were using the platform for legitimate business interests. Dkt. 35 ¶ 81. Because these state law claims are the same sort of claims Congress protected against preemption, they are not preempted.

### 3. *FOSTA's language reinforces the lack of preemption.*

FOSTA confirms that Congress intended to remove *all* obstacles in the CDA to fighting human trafficking, including those that prevented victims from asserting state civil claims. Congress clearly stated its purpose for amending Section 230 in FOSTA's enacting clause:

> To amend the Communications Act of 1934 to clarify that section 230 of such Act does not prohibit the enforcement against providers and users of interactive computer services of Federal and *State* criminal and *civil* law relating to sexual exploitation of children or sex trafficking, and for other purposes.

FOSTA, Pub. L. No. 115-164, 132 Stat. 1253, 1253 (2018) (emphasis added). A statutory preamble or statement of purpose can support a narrow scope of preemption. *Medtronic,* 518 U.S. at 474, 487, 490.

Section 2 of FOSTA further states the "sense of Congress" that Section 230 "was never intended to provide legal protection to . . . websites that facilitate [sex] traffickers in advertising… [their] victims" and that "clarification of such section is warranted to ensure that such section does not provide such protection." Sec. 2, 132 Stat. at 1253. Again, Congress did not distinguish between state or federal claims.

Next, Section 4 of FOSTA, amending Section 230, is titled:

> SEC. 4. ENSURING ABILITY TO ENFORCE FEDERAL AND STATE CRIMINAL AND CIVIL LAW RELATING TO SEX TRAFFICKING.

Sec. 4, 132 Stat. at 1254. State civil law is expressly included and tied directly to the amendments. FOSTA also contains its own savings clause in Section 7:

> **SEC. 7. SAVINGS CLAUSE.**
> Nothing in this Act or the amendments made by this Act shall be construed to limit or preempt any civil action or criminal prosecution under Federal law or State law (including State statutory law and State common law) filed before or after the day before the date of enactment of this Act that was not limited or preempted by section 230 of the Communications Act of 1934 (47 U.S.C. 230), as such section was in effect on the day before the date of enactment of this Act.

Sec. 7, 132 Stat. at 1255. Thus, Congress confirmed that there are civil actions under state common law and statutory law that are not preempted.

FOSTA's legislative history reinforces the lack of preemption. Courts must interpret the statutory text "against the backdrop of regulatory activity undertaken by state legislatures and [the] federal [government]." *Cipollone*, 505 U.S. at 519. When Congress passed Section 230 in 1996, human trafficking was an unknown legal concept. By the time FOSTA was introduced in early 2017, however, every state had enacted criminal laws prohibiting human trafficking and nearly three-quarters had enacted civil remedies. Congress also knew that websites had "become one of the primary channels of sex trafficking." Bob Goodlatte, FOSTA Committee Report, H.R. Rep. No. 115-572, at 3 (2018). Congress knew "bad-actor websites" had been improperly shielded from liability by the CDA. *Id.* at 4.

-16-

### 4. The presumption against preemption requires that Mailchimp's construction be rejected.

Even if Mailchimp's construction was plausibly supported by the statutory text, the presumption against preemption imposes upon courts "a duty to accept the reading disfavoring pre-emption." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005); *see also Cipollone*, 505 U.S. at 518 (noting the "presumption reinforces the appropriateness of a narrow reading" of an express preemption provision). Here, FOSTA's language and legislative history clearly show that Congress did not intend to preempt state law. *See also supra* Part II(A).

### C. The sex trafficking claims do not treat Mailchimp as a publisher.

Claims consistent with those found in Section 230(e)(5) of the FOSTA 2018 amendment are not preempted regardless of whether they treat an internet company as the publisher of third-party content. But even if that provision did not apply, Jane Doe's claims would still not be preempted because they do not treat Mailchimp as the publisher of third-party content under a proper construction of Section 230(c)(1).

### 1. The statutory language is narrow.

Mailchimp relies on Section 230(c)(1) to argue internet companies have a broad immunity from any suit that arises from content generated by third parties:

> No provider or user of an interactive computer service shall be *treated as the publisher or speaker* of any information provided by another information content provider.

47 U.S.C. § 230(c)(1) (emphasis added). Congress could have simply adopted a provision stating that: providers and users of interactive computer services shall be *immune from any legal action that relates to* content provided by a third party. Instead, it defined the area of protection using words with unique legal meanings.

The word "immunity" appears nowhere in the statute. *See Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 406 (6th Cir. 2014); *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009); *City of Chi., Ill. v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010). That word originates with the Fourth Circuit's decision in *Zeran v. America Online, Inc.*, which some courts have relied on to create a broad immunity. 129 F.3d 327, 330 (4th Cir. 1997). But some courts declined to read so much into Congress's words. The Seventh Circuit held that "subsection (c)(1) does not create an 'immunity' of any kind," but "limits who may be called the publisher of information that appears online." *StubHub!*, 624 F.3d at 366.

## 2. *The terms "publisher" and "speaker" relate to defamation.*

The CDA does not define "publisher" or "speaker," so the words must be given their ordinary meaning by examining the context, legislative history, and judicial constructions of the words in other contexts. *See Yates v. United States*, 135 S. Ct. 1074, 1081-85 (2015). Properly construed, this is the language of defamation law. The context concerns liability for information provided online by third parties.

And the statute's legislative history shows that Section 230(c)(1) was adopted to overrule *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), under which Prodigy was held liable for defamation because it exercised editorial control by promulgating content guidelines, despite its lack of knowledge of the content at issue. *See* 141 Cong. Rec. H8469-72 (daily ed. Aug. 4, 1995); H.R. Rep. No. 104-458, at 194 (1996); *see also* 47 U.S.C. § 230(b)(3)-(4).

Given this context, to treat an internet company as a "publisher or speaker" is to impose liability on it (1) for defamatory content provided by a third party (2) of which it had no knowledge (3) because it acted as a "Good Samaritan" by trying to screen objectionable material. Jane Doe asserts no claim for defamation. Dkt. 35 ¶¶ 43-47. She alleges Mailchimp *knew* or should have known that its emails were being used to solicit ads from sex traffickers. *Id.* ¶¶ 6-9, 30-41, 48-54, 61, 76, 81. But even if the protections afforded by Section 230(c)(1) are broader than Congress intended, nothing indicates an intent to give the word "publisher" a broader meaning than in defamation law. Section 230 does not convey a "clear and manifest purpose" by Congress to preempt anything other than defamation and similar claims for which publication is an essential element.[3] *Medtronic,* 518 U.S. at 485; *see also StubHub!,*

---

[3] The Seventh Circuit has asked: "Why should a law designed to eliminate [an internet company's] liability to the creators of offensive material end up defeating

624 F.3d at 366 (obscenity and copyright infringement might also be covered). Jane

Doe's claims are not preempted regardless of FOSTA's effect on the statute.[4]

## III. The Complaint Adequately Alleges Jane Doe's State Law Claims.

### A. The Complaint states a claim for negligence.

#### 1. *Mailchimp owed a duty to Jane Doe.*

Mailchimp argues that Jane Doe's negligence claim fails because she has not

alleged a valid duty that Mailchimp owed to her. Dkt. 43-1 at 21-23. Mailchimp

argues that, if it owed a duty to Jane Doe, it "would be tantamount to requiring

providers of websites and software to protect the entire world from any potential

harm related to a person's use of their products." *Id.* at 22. Jane Doe, however, does

not argue that Mailchimp must protect the "entire world" from "any potential harm."

Rather, Jane Doe alleges that Mailchimp had a duty to, among other things, prevent

its paying clients from using its platform to encourage sex trafficking. Dkt. 35 ¶ 81.

---

claims by the victims of tortious or criminal conduct?" *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003). It is absurd to conclude that Congress intended blanket immunity for internet companies that facilitated the new crime it created.

[4] Mailchimp cites a California decision that concluded claims brought by sex trafficking survivors were preempted by the CDA. Dkt. 43-1 at 21 n.6. Two Texas decisions, however, recently held the opposite. Nos. 2018-69816 & 2018-82214 (334th Dist. Ct. Harris Cty., Tex.); No. 2019-16262 (151st Dist. Ct. Harris Cty., Tex.). Counsel for Jane Doe here is counsel in all three cases, but the hearing in the California case was held in the absence of counsel representing Jane Doe here.

As Mailchimp has recognized, under Georgia law, duty can be imposed either "by a valid statutory enactment of the legislature" or "by a recognized common law principle." Dkt. 43-1 at 21. Here, the TVPRA imposes a legal duty on Mailchimp to refrain from knowingly benefiting from assisting actions which it should have known violated sex trafficking laws. *See* 18 U.S.C. § 1595(a). This provision imposes a standard of care akin to a negligence standard. *Ricchio*, 2019 WL 6253275, at *9. Accordingly, the TVPRA gives rise to a duty sufficient to support Jane Doe's common law negligence claim. *See McLain v. Mariner Health Care, Inc.*, 631 S.E.2d 435, 437-38 & n.18 (Ga. Ct. App. 2006) (allegations of violations of federal statutes were competent to support a breach of duty).

Further, Mailchimp undertook a duty to Jane Doe because Mailchimp created its platform and purported to prohibit its use in connection with websites selling sexual encounters, but Mailchimp failed to adequately monitor its users' activities to prevent misuse of the platform. *See* Dkt. 35 ¶¶ 9, 22-26, 48-63, 79-81. Mailchimp argues that these allegations cannot support a duty because a duty cannot be triggered by a "mere failure to abate a hazardous condition." Dkt. 43-1 at 22-23. But this case does not involve a failure to abate an *existing* hazardous condition. Rather, Jane Doe alleges that Mailchimp greatly increased her risk of harm by creating a platform that facilitated her sex trafficking without taking appropriate action to curb the risk

created by its platform. These circumstances fall directly within the scope of liability approved in Mailchimp's cited case. *See Herrington v. Deloris Gaulden*, 751 S.E.2d 813, 816 (Ga. 2013) (liability is appropriate where "the defendant 'exposes the injured person to a greater risk of harm than had existed previously'").

### 2. *Mailchimp's conduct caused Jane Doe's harm.*

Mailchimp also argues that Jane Doe fails to allege cause in fact and proximate cause. Dkt. 43-1 at 23-24. As to cause in fact, Mailchimp suggests that Jane Doe's allegations rely on "[t]he mere fact that [Jane Doe's] harm allegedly occurred 'after' YesBackpage sent its marketing emails." Dkt. 43-1 at 23. Not true. Jane Doe was harmed directly because of Mailchimp's conduct. Jane Doe's sex trafficker continuously received targeted emails from Mailchimp on behalf of YesBackpage on July 3, 2018 and through July and August 2018. Dkt. 35 ¶¶ 22, 24. As a result of Mailchimp-driven YesBackpage advertisements, Jane Doe's sex trafficker forcibly sold her for sex on YesBackpage and trafficked her throughout 2018. *Id.* ¶¶ 22-23, 55. YesBackpage relied on Mailchimp to inform sex traffickers that YesBackpage had been created as a replacement for Backpage and to encourage them to post their victims for sale. *See id.* ¶¶ 9, 22-24, 55. Mailchimp also caused Jane Doe's injuries by: failing to stop or allowing the online posting of Jane Doe, failing to monitor emails sent on its platform to determine whether they were

associated with illegal activities, and failing to confirm that its customers were using the platform for legitimate business interests. *Id.* ¶ 81.

Mailchimp argues that Jane Doe cannot establish proximate cause because the intervening criminal actions of her sex trafficker sever any causal link. Dkt. 43-1 at 24. If Mailchimp were correct, liability for facilitators of sex trafficking would always be cut off by the sex trafficker's actions. But an intervening criminal act does not defeat proximate cause where the intervening criminal act is a "reasonably foreseeable consequence of defendants' negligent act or omission." *Bethany Grp., LLC v. Grobman*, 727 S.E.2d 147, 150 (Ga. Ct. App. 2012). The question of reasonable foreseeability is "generally for a jury's determination." *Id.* The sex trafficker's criminal acts were the reasonably foreseeable (and even expected) results of Mailchimp's marketing campaign, which drove traffic to a sex trafficking hub. *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1319-21 (N.D. Ga. 2019); *Warner v. Arnold*, 210 S.E.2d 350, 352-54 (Ga. Ct. App. 1974).[5]

---

[5] For the same reasons, YesBackpage's intervening violation of Mailchimp's user policies was foreseeable and does not defeat proximate cause. Dkt. 43-1 at 24. More fundamentally, YesBackpage's violation of Mailchimp's user policies does not defeat proximate cause because the violation was not "sufficient by itself to cause the injury" to the Jane Doe. *Zaldivar v. Prickett*, 774 S.E.2d 688, 698 (Ga. 2015).

**B. Jane Doe is not prohibited from pleading negligence per se.**

Mailchimp argues that Jane Doe's negligence per se claim fails because she is prohibited from maintaining a cause of action under state law where the TVPRA provides a private cause of action. Dkt. 43-1 at 24. Mailchimp's authority addresses whether a plaintiff may bring a claim under both Georgia Code Section 51-1-6 and a federal statute, not negligence per se. *See Higdon v. Jackson*, 393 F.3d 1211, 1221-22 (11th Cir. 2004). This Court already rejected Mailchimp's argument that the same principles apply to negligence per se. *See In re Arby's Rest. Grp. Inc. Litig.*, No. 1:17-CV-0514-AT, 2018 WL 2128441, at *9 & n.11 (N.D. Ga. Mar. 5, 2018). Further, nothing prohibits Jane Doe from asserting alternative claims at this stage. *See* FED. R. CIV. P. 8(d)(2). Mailchimp's arguments that Jane Doe failed to allege causation or a TVPRA violation are addressed above. *See supra* Parts I, III(A)(2).

**C. The Complaint states a claim for gross negligence.**

Mailchimp argues that Jane Doe's claim for gross negligence fails because she failed to plead duty and causation and failed to allege how Mailchimp's conduct displays an absence of "slight diligence." Dkt. 43-1 at 25. The Complaint adequately alleges duty and causation. *See supra* Part III(A). Mailchimp used its software to promote a website that was engaged in sex trafficking and that advertised itself as a replacement for a sex trafficking hub. Dkt. 35 ¶¶ 4-9, 22-26, 30-42, 81. Any persons

"of common sense" would recognize that such actions would facilitate sex trafficking. *See* GA. CODE ANN. § 51-1-4. The question of whether Mailchimp's conduct amounts to gross negligence is a question for the jury. *See Fed. Deposit Ins. Corp. v. Boggus*, No. 2:13-CV-00162-WCO, 2014 WL 12479645, at *4 (N.D. Ga. Aug. 25, 2014); *Wood v. Olson*, 121 S.E.2d 677, 678 (Ga. Ct. App. 1961).

### D. Georgia law does not prohibit aiding and abetting claims.

Mailchimp argues that Jane Doe's claim for aiding and abetting should be dismissed because Georgia law does not provide a free-standing cause of action for aiding and abetting. Dkt. 43-1 at 25. Mailchimp's authority states only that there is no need for an independent cause of action for aiding and abetting *fraud* because a person who aids and abets fraud is liable for fraud as a joint tortfeasor. *Siavage v. Gandy*, 829 S.E.2d 787, 790 (Ga. Ct. App. 2019). But Georgia law recognizes a separate cause of action for aiding and abetting for other claims. *See Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.2d 373, 378 (Ga. Ct. App. 2006) ("Georgia courts have acknowledged a cause of action for procuring an injury or aiding and abetting in a wide array of civil cases ...."); *see also TMX Fin., LLC v. Goldsmith*, 833 S.E.2d 317, 336 & n.9 (Ga. Ct. App. 2019) (distinguishing fraud).

## <u>CONCLUSION</u>

Jane Doe requests that the Court deny Mailchimp's motion to dismiss.

Respectfully submitted,

___/s/___*Annie McAdams*_____

ANNIE MCADAMS, PC
Annie McAdams
annie@mcadamspc.com
Texas Bar No. 24051014
(*admitted pro hac vice*)
ANNIE MCADAMS, PC
1150 Bissonnet
Houston, Texas 77005
(713) 785-6262
(866) 713-6141 (fax)

David E. Harris
dharris@shhlaw.com
Texas Bar No. 24049273
(*admitted pro hac vice*)
Jason Hoelscher
jhoelscher@shhlaw.com
Texas Bar No. 24010671
(*admitted pro hac vice*)
Jeffrey H. Richter
jrichter@shhlaw.com
Texas Bar No. 24061614
(*admitted pro hac vice*)
SICO HOELSCHER HARRIS LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas 98401
(361) 653-3300
(361) 653-3333 (fax)

Patrick J. McDonough
Georgia State Bar No. 489855
pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia State Bar No. 303999
jtonge@atclawfirm.com
ANDERSEN, TATE & CARR, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900
(770) 822-9680 (fax)

Michael T. Gallagher
mike@gld-law.com
Texas Bar No. 07586000
(*admitted pro hac vice*)
Pamela McLemore
pamm@gld-law.com
Texas Bar No. 24099711
(*admitted pro hac vice*)
Boyd Smith
Texas Bar No. 18638400
(*admitted pro hac vice*)
THE GALLAGHER LAW FIRM
2905 Sackett Street
Houston, Texas 77098
(713) 222-8080
(713) 222-0066 (fax)

_/s/ Warren W. Harris_
Warren W. Harris
warren.harris@bracewell.com
Texas Bar No. 09108080
(*admitted pro hac vice*)
BRACEWELL LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-1490
(800) 404-3979 (fax)

Attorneys for Jane Doe

## <u>CERTIFICATE OF SERVICE</u>

I certify that this response to Mailchimp's motion to dismiss was electronically filed and served on counsel of record using the CM/ECF system this 6th day of April 2020.

_/s/ Warren W. Harris_
Warren W. Harris

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing response to motion to dismiss has been prepared using 14 point Times New Roman font, with a top margin of not less than 1.5 inches and a left margin of not less than 1 inch in compliance with Local Rule 5.1(C) and (D).

_/s/ Warren W. Harris_
Warren W. Harris
